

U.S. FILED
EASTERN DISTRICT COURT
DISTRICT OF LA

2003 NOV -7 AM 11: 47

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RONNIE PARKER | * | CIVIL ACTION |
| | * | |
| Plaintiff, | * | NO. 03-0545 |
| | * | |
| VERSUS | * | SECTION R/3 |
| | * | |
| ROWAN COMPANIES, INC. | * | JUDGE VANCE |
| | * | |
| Defendant. | * | MAGISTRATE JUDGE KNOWLES |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

## MEMORANDUM IN OPPOSITION TO
## MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL

Laurence E. Best, Peter S. Koeppel and Best Koeppel APLC, (collectively, "Best Koeppel") submit this Memorandum and attached evidence in opposition to the Motion to Disqualify Plaintiff's Counsel ("Motion to Disqualify") filed on behalf of Rowan Companies, Inc. ("Rowan") and in accordance with this Honorable Court's Order of July 31, 2003. As shown by the evidence submitted by the parties, Rowan has failed to establish any grounds for disqualification and its Motion should be denied.

Fee____
Process____
Dktd____
CtRmDep____
Doc. No.____

- 1 -

696678/2

## I.   **BACKGROUND**

Best Koeppel formerly represented Rowan, primarily defending routine individual lawsuits brought by workers who claimed to have been injured during the course of their employment.   In the late 1980s and early 1990s, Best Koeppel received a large number of assignments from Rowan.   Mr. William Hedrick, Best Koeppel's primary ongoing contact with Rowan, told Mr. Best that his firm was Rowan's primary defense counsel and was receiving and would continue to receive assignments of the defense of most of their lawsuits, including, but not limited to those in Louisiana, Texas and Mississippi.   Affidavit of Laurence E. Best, attached hereto as BK Exhibit 1.   However, in the late 1990s, the number of assignments began to dwindle, as shown by a list of the number of Rowan files opened by Best Koeppel each year, attached hereto as BK Exhibit 1(A).   Best Affidavit, ¶ 4.   Mr. Best repeatedly expressed concern to Mr. Hedrick about this apparent change in Rowan's relationship with Best Koeppel, but Mr. Hedrick continued to assure Mr. Best that his firm was receiving and would continue to receive the defense of all cases filed in the Eastern District of Louisiana, with the possible exception of unusual types of cases, such as mass tort or complex litigation which was beyond his small firm's capacity.   Best Affidavit, ¶ 4.   Mr. Best also was assured that the services and performance of his firm were excellent and more than satisfactory.   Nonetheless, assignments  continued to dwindle so that by the Spring, 2002, Best Koeppel was defending only a single routine case for Rowan, *Cantner v. Rowan Companies, Inc., infra.*   Best Affidavit, ¶ 4.

Mr. Best requested an opportunity to meet with Mr. Hedrick personally to discuss the status of his firm's relationship with Rowan.   Mr. Hedrick informed Mr. Best that he would be in New Orleans and available for a breakfast meeting on or about February 19, 2002.   Best

696678/2

Affidavit, ¶ 4. Mr. Hedrick told Mr. Best that he would be involved in contract negotiations in New Orleans with one of Rowan's customers that day and that he would therefore be available that morning. Best Affidavit, ¶ 5; Affidavit of Peter S. Koeppel, ¶ 13, attached hereto as Exhibit BK 2. At the breakfast meeting, Mr. Koeppel and I expressed our concerns about Best Koeppel's diminished representation of Rowan. Mr. Hedrick assured us that we would continue to receive all assignments in the Eastern District of Louisiana, but he represented that there had not been any cases brought in this district recently. *Id.* However, later that morning, after the breakfast meeting, Best and Koeppel learned that Mr. Hedrick, in fact, was in federal court that day for a settlement meeting regarding a claim brought against Rowan and which was being defended by another New Orleans area firm. Best Affidavit, ¶ 5; Koeppel Affidavit, ¶ 13.

Given that Best Koeppel was representing Rowan in only one case at that time, they concluded that Rowan was constructively terminating them as its counsel. Because this appeared to be Rowan's objective, and because of Mr. Hedrick's failure to keep his commitment regarding case assignments, together with his misrepresentation as to his whereabouts on February 19, Best Koeppel determined to terminate its relationship with Rowan. Best Affidavit, ¶ 6. They did so by letter dated March 5, 2002, a copy of which is attached as Exhibit 3 to Rowan's Motion to Disqualify. Around the same time, Best Koeppel withdrew as counsel for Rowan in the *Cantner* case. *Id.*

At the time they terminated their representation of Rowan, Best Koeppel knew nothing about Ronnie Parker or his accident. Best Affidavit, ¶ 8. Approximately six months later, in September 2002, Best Koeppel was contacted by Mr. John Lee, Jr., Parker's Mississippi

- 3 -

attorney, regarding the possibility of joining as co-counsel in representing Mr. Parker in connection with a potential claim against Rowan. Best Affidavit, ¶ 8. In February, 2003, nearly a year after withdrawing as counsel in *Cantner*, Best Koeppel began representing Mr. Parker as counsel of record in this matter and the Complaint was filed on February 20, 2003. *Id.*

Mr. Parker had been employed as a floor hand on Rowan's CECIL PROVINE rig. He was seriously injured while working on the floor of the rig when the cathead and draw works malfunctioned due to Rowan's negligence and the unseaworthiness of the vessel. Complaint in *Parker v. Rowan Companies, Inc.*, ¶ V, attached hereto as BK Exhibit 3. The malfunction of the cathead and draw works resulted in a significant blow and injury to Parker's right arm. *Id.* As a result of Parker's injury, he developed complications and a syndrome known as reflex sympathetic dystrophy affecting his right upper and lower extremities and, eventually, his entire body. *Id.* Mr. Parker's dystrophy was caused by his injury, but his susceptibility to developing the syndrome may have been enhanced by the negligent failure of a Rowan employee charged with accompanying Mr. Parker when he visited his physician to have a prescription filled which was given to Parker by the physician. Best Affidavit, ¶ 9. The *Parker* Complaint alleges negligence and unseaworthiness in connection with the aforesaid accident, as well as the failure to provide proper medical care (based upon neglecting to fill the prescription), and further seeks maintenance and cure based upon Parker's status as a seaman at the time he was injured.

Rowan filed this Motion to Disqualify on April 17, 2003. On June 26, 2003, the Court granted Rowan's Motion to Conduct Discovery Relating to Motion to Disqualify, allowing both parties to conduct discovery. The parties exchanged written discovery requests and agreed

696678/2

to a September 22, 2003 date for the corporate deposition of Rowan. Best Koeppel's primary goal in its written discovery requests and in seeking the corporate deposition was to require Rowan to furnish specific details underlying the broad generalities offered in the evidence and argument in its original submission in support of the Motion to Disqualify and to obtain copies of documents Rowan relied upon but did not offer into evidence. Best Koeppel is convinced that if Rowan is required to produce such detail, the hollowness of the generalities it advances will be exposed. The Court is well aware of Rowan's refusal to furnish the details and documents sought in written discovery and Best Koeppel will not delve into the issues raised by that still-pending discovery controversy, rather referring the Court to the memoranda submitted in support of the appeal from the Magistrate Judge's order. Rowan also has thus far successfully avoided the taking of its corporate deposition.[1] Thus, Best Koeppel has been stymied in its effort to expose the insubstantiality of Rowan's generalities by probing into the details.

---

[1]     Largely because of space limitations, Best Koeppel will resist the temptation to recount the torturous history of its efforts to schedule and conduct a meaningful corporate deposition of Rowan. However, that history is largely chronicled in the following correspondence between counsel: Correspondence from George Ernest, III to Keith Hall, September 18, 2003, attached hereto as BK Exhibit 4; Correspondence from George Ernest, III to Stephen Bullock, dated October 1, 2003, attached hereto as BK Exhibit 5; Correspondence from Stephen Bullock to David Hurlburt and George Ernest, III dated October 2, 2003, attached hereto as BK Exhibit 6; Correspondence from David Hurlburt to Stephen Bullock, dated October 3, 2003, attached hereto as BK Exhibit 7; Correspondence from Stephen Bullock to David Hurlburt, dated October 6, 2003, attached hereto as BK Exhibit 8; Correspondence from David Hurlburt to Stephen Bullock, dated October 7, 2003, attached hereto as BK Exhibit 9; Correspondence from David Hurlburt to Stephen Bullock, October 14, 2003, attached hereto as BK Exhibit 10; Correspondence from Stephen Bullock to David Hurlburt and George Ernest, III, dated October 23, 2003, attached hereto as BK Exhibit 11; Correspondence from George Ernest, III to Stephen Bullock dated October 24, 2003, attached hereto as BK Exhibit 12;
*(continued on next page)*

However, if Rowan has won the battle, by averting Best Koeppel's demand for detail, it nonetheless should lose the war. As discussed below, the burden Rowan must meet to disqualify Best Koeppel requires that it furnish to the Court the kind of detail that is lacking in its evidence and argument and that it has refused to provide in discovery. By refusing to furnish that detail (undoubtedly because it does not exist or because it would clearly reveal that there are no grounds for disqualification), Rowan has failed to meet its burden and its Motion must be denied.

---

Correspondence from Stephen Bullock to George Ernest, III, dated October 27, 2003, attached hereto as BK Exhibit 13; Correspondence from David Hurlburt to Stephen Bullock, dated October 28, attached as BK Exhibit 14; Correspondence from Stephen Bullock to David Hurlburt, dated October 28, 2003, attached hereto as Exhibit 14A. Best Koeppel eventually came to realize that because of Rowan's refusal to produce documents and the virtual certainty that any probing questions at a corporate deposition would be met by a refusal to answer based on the Magistrate Judge's discovery ruling, such a deposition would be of little value. When faced with the prospect of having to litigate with Rowan regarding the scheduling of their own depositions, Best Koeppel determined it was preferable to reach an agreement that both parties would submit evidence by affidavit rather than deposition and Rowan would submit its supplemental evidence in advance of the due date of Best Koeppel's submission. Best Koeppel believes that Rowan's strategic machinations herein have been geared toward three goals: (1) preventing production of documents and information that would permit penetration of the superficial allegations it has advanced in support of its Motion to Disqualify; (2) avoiding a meaningful corporate deposition of Rowan; and (3) delaying the hearing on the Motion to Disqualify. Thus far, it has not succeeded in achieving objective (3). Despite Best Koeppel's best efforts to probe and expose the emptiness of Rowan's case, Rowan has succeeded in accomplishing objectives (1) and (2). However, this should be of no avail to Rowan because, by continuing to rely on hollow generalities, Rowan has failed to meet its burden to prevail on its Motion to Disqualify.

696678/2

## II.    LAW AND ARGUMENT

### A.    Rule 1.9 of LOUISIANA RULES OF PROFESSIONAL CONDUCT Embodies the National Ethical Standards Regarding Conflicts of Interest with Respect to Former Clients.

The Fifth Circuit has held that motions to disqualify are to be governed by state and national ethical standards adopted by the Court. *In Re American Airlines, Inc.*, 972 F.2d 605, 609-610 (5th Cir. 1992), *cert. denied*, 507 U.S. 912, 113 S. Ct. 1262 (1993); *FDIC v. U.S. Fire Insurance Co.*, 50 F.3d 1304, 1311-1312 (5th Cir. 1995). Such motions are to be decided under the ethical rules announced by the national profession in light of the public interest and the litigants' rights. *In Re Dresser Industries, Inc.*, 972 F.2d 540, 543 (5th Cir. 1992). Courts also are to consider their local rules, such as this Court's adopted ethical rules, the LOUISIANA RULES OF PROFESSIONAL CONDUCT. *Id*. Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law. *Id*.

Rule 1.9 of the LOUISIANA RULES OF PROFESSIONAL CONDUCT addresses conflicts of interest with respect to former clients. This rule is based upon Rule 1.9 of the American Bar Association MODEL RULES OF PROFESSIONAL CONDUCT. Likewise, Section 132 of the American Law Institute RESTATEMENT OF THE LAW GOVERNING LAWYERS (THIRD) ("Restatement") contains essentially the same provisions. Thus, the Louisiana rule embodies the universally accepted, national ethical norms regarding this issue. The Louisiana rule provides:

Rule 1.9 Conflict of Interest: Former Client

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Thus, a party seeking to disqualify its former counsel from representing another party in a matter adverse to the former client has the burden of establishing: (1) that the current matter is "substantially related" to the prior representation or (2) that the client actually obtained during the course of the prior representation (a) confidential information, (b) that can be used to the disadvantage of the client in the current case.

### B. There is No "Substantial Relationship" Between *Parker* and Any of Best Koeppel's Prior Representations of Rowan Under Rule 1.9(a)

Rule 1.9(a) adopts the "substantial relationship" test. If the test is met, disqualification is required without further inquiry. *In Re Corrugated Container Antitrust Litigation*, 659 F.2d 1341 (5th Cir. 1981). However, substantial relationship is an exacting standard and the party seeking disqualification bears the burden of establishing that it has been met. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1028 (5th Cir. 1981), *cert. denied*, 454 U.S. 895 102 S. Ct. 394 (1981). It is clear that Rowan has not come close to doing so here.

### 1. The Appearance of Impropriety Standard is Irrelevant to the Court's Inquiry.

As will be discussed shortly, the Rule 1.9 tests and the methodology for applying them are clear from the ethical rules themselves and from Fifth Circuit case law. However, in order to inject ambiguity and confusion into these clear criteria controlling the instant motion, Rowan cites inapposite references in certain cases to the "appearance of impropriety" concept embodied in Canon 9 of the now superceded ABA Model Code of Professional Responsibility.

- 8 -

Rowan would like to avoid the rigors of the substantial relationship test and the methodology approved by the Fifth Circuit for applying it by superimposing as an independent criterion outside the substantial relationship test a vague, indefinite inquiry into whether there is an "appearance of impropriety" in Best Koeppel representing Parker against Rowan. However, it is clear from Fifth Circuit precedents that such an inquiry has no place in resolving the disqualification issue.

As noted in *In Re: American Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992), *cert. denied*, 507 U.S. 912 (1993), this Circuit adopted the substantial relationship test before that test was expressly included in any national or local ethical standard or rule. 972 F.2d at 614, 617.[2]

> The 1969 ABA Model Code of Professional Responsibility did not contain a provision specifically related to subsequent representation in private cases. However, a substantial body of case law developed on the subject, primarily relying on the duties to protect client confidences and secrets under Canon 4 and to avoid the appearance of impropriety under Canon 9 of the ABA Model Code.

Restatement, Section 132, Comment (b). *See also,* Moore, RESTATING THE LAW OF LAWYER CONFLICTS, 10 Geo. Journal J. Legal Ethics, 541, 543-544. In 1983, the ABA adopted the Model Rules of Professional Conduct to replace the Model Code. *Federal Deposit Insurance Corporation v. U.S. Fire Insurance Company*, 50 F.3d 1304, 1309, n. 4 (5th Cir. 1995). Rule 1.9 of the Model Rules fills the void in the Model Code, adopting the jurisprudentially developed substantial relationship test to determine the circumstances under which an attorney may

---

[2]    "Our precedents did not rely on the Model Code or Model Rules in formulating the substantial relationship test, but on the landmark *TC Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F. Supp. 265 (SDNY 1953), which predated the Model Code and of course the Model Rules." 972 F.2d at 617.

696678/2

represent a party in a matter adverse to the attorney's former client, thus eliminating the need to

resort to vague ethical principles as underpinnings for this concrete, definite standard.

Moreover, the Model Rules completely eliminated any reference to the

ambiguous and troublesome "appearance of impropriety" standard.

> To the ABA drafters [of the Model Code], the injunction to avoid the appearance
> of impropriety was meant to serve as an aspirational principle to guide lawyers in
> the exercise of their independent judgment, and perhaps as a principle of
> interpretation, calling for restrictive readings of the disciplinary rules in areas of
> uncertainty.  It was not intended to serve as a disciplinary standard or a
> disqualification rule.  Courts, disciplinary bodies, and ethics committees soon
> discovered, however, that the Code's disciplinary rules did not adequately address
> the full spectrum of lawyers' questionable conduct.  Some seized upon the
> appearance of impropriety language as a catch-all to address the Code's perceived
> shortcomings.  As a result, these institutions soon began to rely on the appearance
> of impropriety standard in evaluating the propriety of lawyers' conduct.  Further,
> they came to use it not only in opinions addressing government lawyers' conflicts
> of interests, but also in addressing privately retained lawyers' conflicts of
> interests.
>
> In response, a number of courts and commentators, together with the ABA's
> ethics committee, took the view that it was inappropriate to employ so vague a
> standard for anything other than lawyers' individual guidance.  Their conviction
> that more precise and objective measures were needed for disciplinary and
> disqualification purposes carried the day in 1983 when the ABA, in replacing the
> Model Code with the Model Rules of Professional Conduct (Model Rules),
> pointedly eliminated the appearance of impropriety standard.  In the succeeding
> years the overwhelming majority of states adopted provisions based on the ABA
> Model Rules and all but one, in doing so, followed the ABA's lead.  [Internal
> citations omitted]

Stein, CONFLICTS OF INTEREST IN LEGAL REPRESENTATION:  SHOULD THE APPEARANCE OF

IMPROPRIETY RULE BE ELIMINATED IN NEW JERSEY – OR REVIVED EVERYWHERE ELSE? 28 Seton

Hall L. Rev. 315, 317-18 (1997).  In particular, adoption of the "substantial relationship" test in

Rule 1.9 reflected a plain intention on the part of the Model Rules drafters to abandon the

- 10 -

appearance of impropriety concept as an independently operating standard in the "former client"

context. *Id.* at 333. As Comment 5 to Rule 1.9 of the Model Rules states:

> The other rubric formerly used for dealing with disqualification is the appearance
> of impropriety proscribed in Canon 9 of the ABA MODEL CODE OF PROFESSIONAL
> RESPONSIBILITY. This rubric has a two-fold problem. First, the appearance of
> impropriety can be taken to include any new client-lawyer relationship that might
> make a former client feel anxious. If that meaning were adopted, disqualification
> would become little more than a question of subjective judgment by the former
> client. Second, since "impropriety" is undefined, the term "appearance of
> impropriety" is question-begging. It therefore has been recognized that the
> problem of disqualification cannot be properly resolved either by simple analogy
> to a lawyer practicing alone or by the very general concept of appearance of
> impropriety.

The Fifth Circuit in *American Airlines* recognized the universal rejection of the

appearance of impropriety standard and held that it is no longer a matter to be considered in

applying the substantial relationship test. The Court stated: "We agree with Northwest that the

'appearance of impropriety' has no relevance to our probe of ethical restraints." 972 F.2d at 619.

Rather, the Court held the client's interests in confidentiality and in the loyalty of his attorney are

the fundamental concerns at issue. 972 F.2d at 616.[3]

It is important to understand the context in which the *American Airlines* Court had

occasion to consider the interests underlying the substantial relationship test. In that case, the

party resisting disqualification contended that a substantial relationship exists "only where the

two cases are so closely related that the risk of adverse use of the former client's confidences

---

[3]     Interestingly, Rowan cites this language at page 5 of its Original Memorandum without
acknowledging the implications of this rejection to its arguments elsewhere that the
appearance of impropriety should be considered here.

threatens to 'taint' the trial." 972 F.2d at 615. That party also argued that a close relation between a past and current representation is irrelevant if the attorney relied on publicly available information in advising the former client. *Id*. These two arguments were rooted in the larger assertion that "the substantial relationship test is solely concerned with protecting a former client's confidences." *Id*. Thus, the Court was confronted with and rejected an argument that disqualification is not automatically required though the cases are substantially related if there is no proof of actual prejudice to the former client from use of confidential information acquired during the prior representation.

In finding that the substantial relationship test furthers a client's loyalty and confidentiality interests, the Court in no way suggested that there should be any extraneous inquiry in determining disqualification beyond application of the substantial relationship test. On the contrary, the Court held that the substantial relationship test is the sole inquiry to be applied in every case, as had been the rule before adoption of the Model Rules, and that application of the test was not excused by proof of the absence of "taint." The Court stated:

> We believe that our application of the substantial relationship test under the Rules is the same as it was under the Code. Thus, as in our past cases, our inquiry is limited to the single question of whether VE's prior representations of *American* are substantially related to the present case.

972 F.2d at 621. *American Airlines* also makes clear that, in every case, the strict methodology established by the case law for application of the substantial relationship test is to be adhered to.

> Rather, a substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action" common to prior and current representations and the Court engages in a "painstaking analysis of the facts and precise application of precedents." [*Citing Duncan*, 646 F.2d at 1029 (quoting *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 174 (5th Cir. 1979).] Finally, the party seeking disqualification

bears the burden of proving that the present and prior representations are substantially related. *Duncan*, 646 F.2d at 1028.

972 F.2d at 614.

### 2. The Length of Relationship and Fees Earned Are Irrelevant to the Court's Substantial Relationship Inquiry.

Again, seeking to muddle the clear substantial relationship methodology called for by Fifth Circuit precedents, Rowan argues that such matters as "the length and breadth of the relationship" and "the fees earned by the attorney" are relevant factors in the analysis. Original Memorandum in Support, p. 7. The cases cited by Rowan do not support its argument. In no Fifth Circuit case cited did the Court indicate that the length of the attorney-client relationship or the amount of fees paid was relevant to the substantial relationship determination; at most, these matters were mentioned in passing as part of the Court's general background narrative or as among the reasons that the case should not be treated as an exception to the substantial relationship test. Indeed, the Fifth Circuit has specifically downplayed the length and number of prior representations as being determinative. *See, e.g., Duncan*, 646 F.2d at 1029.

### 3. Fifth Circuit Precedent Establishes the Methodology for Determining Substantial Relationship: Painstaking Factual Analysis to Determine Whether There is an Identity of Subject Matter.

A review of the Fifth Circuit decisions applying the substantial relationship test to concrete cases makes clear the type of analysis called for. As summed up in *American Airlines*, the methodology for determining whether two representations are substantially related is to

696678/2

determine, after a "painstaking analysis of the facts," whether they involve "the same subject matter." 972 F.2d at 614, 625.[4]

  In the *American Airlines* case, the Court examined in great detail the subject matter of each of the prior representations and of the current representation to determine whether there was a substantial relationship. The case before the Court in which *American's* former counsel, Vinson & Elkins ("VE"), represented the plaintiff, Northwest Airlines, was an antitrust case. The complaint, both in Northwest's suit and in a consolidated suit filed on behalf of Continental Airlines, alleged attempted monopolization of air transportation services by predatory pricing in violation of the Sherman Act. 972 F.2d at 607. VE had represented *American* in several matters in the past and the Court found that three of the prior representations were substantially related to the current case. In two of them, VE had defended *American* in suits brought against it by Continental in Texas. The focus of each of these suits was SABRE, American's computerized reservation system (CRS). The third representation involved VE's counseling of American concerning whether the Antitrust Division of the Department of Justice would approve a proposed acquisition by American of Continental. *Id.* at 621.

  Northwest argued that the two litigation cases were not substantially related to the current suit because the allegations in those actions pertained only to CRS services and not air transportation services. The Court disagreed, finding that, while the focus in those cases was

---

[4] Rowan also attempts to import a rule alien to this Circuit to the effect that "[i]f there is any doubt" regarding substantial relationship, the Court should disqualify. Original Memorandum in Support, p. 7. No Fifth Circuit case employs this extreme standard.

696678/2

CRS systems, the plaintiffs also had raised claims involving air transportation markets. Moreover, the Court found that the Texas cases involved two specific matters also at issue in the present case. *Id.* The Court then proceeded to analyze the common subject matter of all three cases in minute detail and concluded that because of the overlap in subject matter, the cases were substantially related.[5]

---

[5]     In one prior lawsuit, Continental alleged that American had breached contractual relationships and committed other acts of misconduct in operating its CRS. In that lawsuit, Continental claimed that American and United Airlines, by leveraging their dominance as air carriers, established themselves as the dominant CRS providers and that American, having achieved dominance in the CRS market, had, in turn, used SABRE to exclude Continental from specific airline passenger markets. Moreover, the Court found that American's alleged attempted monopolization of the Dallas-Fort Worth airport was foreseen by VE's attorneys as an issue in the case. Finally, Continental cited an alleged price-fixing solicitation of another airline by American's president as evidence supporting its claim. *Id.* at 621-622. In the current lawsuit between Northwest and American, Northwest claimed that American had monopolized or attempted to monopolize five different air transportation markets, including Dallas-Fort Worth. Moreover, the alleged solicitation by American's president also was prominently featured in Northwest's current complaint. These clear overlaps in subject matter caused the two representations to be substantially related. *Id.* at 622-623. In the second prior litigation, a Continental affiliate had brought an antitrust suit against American charging violation of the antitrust laws in American's provision of CRS services. In that case, plaintiff presented the CRS and air transportation markets as inextricably interlinked, alleging that "AA has used its monopoly power in the provision of air carrier services in various geographic markets to obtain, retain and enhance its power in the provision of CRS systems." Continental alleged that AA's anti-competitive practices were aimed not only to reap monopoly profits from the CRS systems, "but to enhance profits from the provision of air transportation services." *Id.* The Court pointed to extensive discovery regarding SABRE's effect on air transportation revenue and the issue of "incremental airline revenue." Again, the Court found that this prior representation and the current antitrust suit brought by Northwest and Continental involved the same subject matter and were thus substantially related. *Id.* at 623-624.

The Court then considered whether VE's representation of American in advising whether a merger with Continental was likely to avoid challenge under the Department of Justice antitrust merger guidelines was substantially related to the current antitrust case.   A memorandum prepared by American in connection with that prior matter indicated that the guidelines' main concern was whether a merger was likely to create, enhance or facilitate the exercise of market power by remaining participants in the relevant market.   The memorandum further stated that market power is more easily inferred under narrowly defined markets and that it was therefore in American's interest to avoid a market definition that was improperly narrow. *Id.* at 625.   The Court found that precisely these issues were at the heart of the present case.   VE's prior representation necessarily required a detailed evaluation of American's operations in the various markets that might be deemed relevant and the current litigation would involve similar issues. *Id.* at 625-626.   Again, because of this clear overlap in specific factual subject matter, the two representations were found to be substantially related.   Thus, the Court held that American had succeeded in "delineat[ing] with specificity the subject matters, issues and causes of action" common to the prior and present representations, as demanded by Fifth Circuit precedent (*citing Duncan*, 646 F.2d at 1029). *Id.*   Summarizing the Circuit's approach, *American Airlines* distilled from the case law the rule that two representations that "involve the same 'subject matter'" are substantially related. *Id*. at 625.

*American Airlines* relied heavily on *Duncan, supra*, where the Court applied "the painstaking factual analysis" required to determine whether disqualification is appropriate under the substantial relationship test.   The lawsuit before the Court, in which Merrill Lynch's former

696678/2

counsel represented the plaintiff, alleged that Merrill Lynch had made untrue statements and omitted to state material facts in connection with the sale of certain municipal bonds to the plaintiff. Plaintiff asserted that Merrill Lynch had violated the federal securities laws, Regulation T of the Federal Reserve Board and the Florida blue sky statute. He also alleged common law fraud, breach of fiduciary duty and violations of Florida usury laws. The factual allegations of the complaint claimed that Merrill Lynch engaged in certain improper practices in purchasing and selling bonds for its customers, including certain activities involving its customers' margin accounts.[6]

      Merrill Lynch filed a motion to disqualify plaintiff's counsel, alleging that there was a substantial relationship between the current case and counsel's prior representations of Merrill Lynch. As evidence of the requisite "substantial relationships," Merrill Lynch filed an affidavit of one of its vice presidents identifying ten different matters in which plaintiff's counsel had represented Merrill Lynch over a ten year period, listing various general types of subject

---

[6]    Plaintiff alleged that Merrill Lynch had (1) acted as an undisclosed principal, (2) sold bonds out of its own inventory without disclosing that the bonds were available elsewhere at a lower price, (3) obtained commitments from customers for bond purchases at a specified price and then purchased the bonds in the market at a lower price, (4) purchased bonds from customers at below the market price without advising that the bonds would obtain a higher price in other markets, and (5) failed to advise customers that it charged a commission on its bond transactions. Finally, plaintiff alleged that Merrill Lynch had violated Regulation T by manipulating "buying power" generated in customers' margin accounts to reduce the amount of cash necessary for purchases in customers' cash accounts.

matter involved in the cases and describing interactions between counsel and Merrill Lynch personnel, as well as litigation activities performed by former counsel.[7]

In a memorandum accompanying the disqualification motion, Merrill Lynch elaborated on two of the ten cases. In one, former counsel had represented Merrill Lynch and three of its employees in a securities action brought by a plaintiff who maintained a margin account with Merrill Lynch. Merrill Lynch stated that the case involved substantial amounts of discovery, including a deposition of the Merrill Lynch vice president, and that in the course of preparing discovery responses, counsel were in frequent communication with Merrill Lynch to develop the necessary information and documentation with regard to the plaintiff's actions and Merrill Lynch's procedures for handling margin accounts. In the second case, former counsel had defended Merrill Lynch against allegations that it had mishandled a customer "stop order" in violation of the anti-fraud provisions of the Florida blue sky statute and of its duties under Florida common law of fraud, negligence and contract.

Despite "general similarities" between certain of the claims made in these two prior cases and those in the current case and the litany of activities in which former counsel

---

[7]     The affidavit stated that these matters "involve stock, commodities, municipal and government securities, margin accounts, Merrill Lynch's relationships with its customers, Merrill Lynch's relationships with its employees, Merrill Lynch's procedures and its records, the rules and regulations of various regulatory bodies, the federal securities laws . . ., class actions and common law." The affidavit also stated that the work performed by former counsel included reviews of Merrill Lynch records, conferences with Merrill Lynch officers and employees, legal research, depositions, interrogatories, requests for production, expert witnesses, hearings, motions, trials and appeals. It also stated that counsel had worked closely with attorneys in Merrill Lynch's legal department and other Merrill Lynch representatives.

696678/2

engaged in numerous prior cases, the Fifth Circuit held that Merrill Lynch had described "only a general, superficial connection between the subject matters of these cases" and that of the current case and had left the Court to guess the precise nature of the relationship between the pending and former representations.   Noting that Merrill Lynch had "said nothing about the specific nature" of the prior cases, the Court held that the focus of the substantial relationship inquiry should be on the precise nature of that relationship.

> Merely stating that the previous representation involved securities work, conferences with Merrill Lynch's employees, and the preparation of various legal documents provides the district court with no opportunity to engage in a "painstaking analysis of the facts."  The statements offered by Merrill Lynch . . . could be applied to virtually any law firm that had ever represented Merrill Lynch or any large brokerage firm.  However, the fact that [former counsel] used to represent Merrill Lynch, even on a variety of matters and over a relatively long period of time is alone insufficient to establish the required nexus with the present case.  . . . Only when the moving party delineates with specificity the subject matters, issues, and causes of action presented in the former representation can the district court determine if the substantial relationship test has been met.  Merely pointing to a superficial resemblance between the present and prior representations will not substitute for the careful comparison demanded by our cases.

646 F.2d at 1029.  For example, the Court noted that though Merrill Lynch pointed out that the prior cases involved causes of action arising under federal and state securities laws, it had made no attempt to describe the precise issues involved in those cases or to relate those issues to the questions raised in the instant suit.  *Id.* at 1030.  Similarly, while Merrill Lynch stated that its procedures for handling margin accounts were at issue in one of the prior cases, it failed to explain how the margin account question raised in that case related to the margin account question presented in the current case.  *Id.*

As to Merrill Lynch's complaint that its former counsel was privy in the prior representations to Merrill Lynch's internal "practices and procedures," the Court held that this did not constitute a basis for disqualification. Rather, Merrill Lynch would have had to prove that counsel "has knowledge of the particular practices and procedures which are the subject matter of [the instant] suit." 646 F.2d at 1032.

4.   **The *Parker* Case is Not Substantially Related to Any Prior Case in Which Best Koeppel Represented Rowan.**

   a.   **Parker is Not Substantially Related to <u>All</u> the Cases in Which Best Koeppel Represented Rowan.**

Probably because Rowan recognizes that it cannot point to a single prior representation of Rowan by Best Koeppel that meets the Fifth Circuit substantial relationship test, Rowan takes a scattershot approach, maintaining that "[a]ll of the cases in which Mr. Best, Mr. Koeppel, or the firm of Best Koeppel represented Rowan, either singularly or in combination are substantially related to the *Parker* case. . . ." Rowan's Response to Best Koeppel's Interrogatory No. 2, attached hereto as BK Exhibit 15.[8] In its submissions, Rowan points to the following factors which it contends result in all prior cases being substantially related:

- Most of the cases involved Jones Act, unseaworthiness and/or maintenance and cure causes of action asserted by Rowan employees.

---

[8]   In fact, Rowan is even trying to disqualify Best Koeppel in *Burch v. Rowan Companies, Inc.*, No. A030089-C in the Judicial District for Orange County, Texas, an action for workers' compensation employment discrimination case, even though Best Koeppel never represented Rowan in workers' compensation matters. *See* Rowan Exhibit 7-V; Best Affidavit, ¶ 3; Koeppel Affidavit ¶ 14.

- The majority of the prior representations involved Rowan's offshore fleet of mobile offshore drilling units (MODUs) which are similar in nature, in that they are jack up drilling vessels, and are staffed similarly.
- Other cases involved claimants who were floormen or drill crew members.
- Mr. Hedrick was Best Koeppel's primary contact at Rowan, usually served as Rowan's Company representative and frequently testified at trial and was the deponent in some depositions defended by Best Koeppel.
- The expert witnesses Rowan may call in the *Parker* case have been involved as expert witnesses in some of the prior cases in which Best Koeppel represented Rowan.
- Rowan, through Mr. Hedrick, provided Best Koeppel with documents regarding Rowan's "safety practices and procedures."
- Best Koeppel discussed with Rowan, through Mr. Hedrick, "trial strategies and tactics."
- Rowan, through Mr. Hedrick, sought advice and counsel "on a number of issues."
- Best Koeppel had access to privileged claim files and was privy to "confidential conversations with Rowan's risk management."
- Rowan, through Mr. Hedrick, provided Best Koeppel with "confidential and privileged information" regarding calculation of maintenance and cure.
- Rowan imposed on Best Koeppel and its other outside defense counsel standardized procedures and instructions that they were expected to follow when representing Rowan.

Original Memorandum in Support, pp. 9-10, 12, Hedrick Declaration, Rowan Exhibit 7, ¶¶ 6, 7, 11 and 13.

It is clear that the factors relied upon by Rowan to establish a substantial relationship between the *Parker* case and all of the litigation cases in which Best Koeppel previously represented Rowan do not even begin to meet the criteria for substantial relationship under the case law. That the causes of action asserted in many of the prior cases are the same as those asserted in *Parker*, that the majority of the prior lawsuits, like *Parker*, involved accidents that occurred on jack up drilling vessels and that some were brought by claimants who

696678/2

performed the same or similar job functions as Mr. Parker are superficial similarities that do not demonstrate a substantial relationship between those cases. The Fifth Circuit requires more substantive similarities based upon the same subject matter being involved in the prior suits and the current one.

Rowan apparently maintains that because Best Koeppel dealt primarily with Mr. Hedrick in past cases and defended some depositions he gave and because Mr. Hedrick also will likely be Rowan's company representative in the *Parker* case, this causes the representations to be substantially related. However, the identity of counsel's contact point with the client and defense of his depositions in prior cases do not reflect in any way upon the identity of the subject matter of the cases. These facts have not been accorded any weight in Fifth Circuit cases and they are irrelevant to the substantial relationship issue. Likewise, without more detail as to the specific subject matter of the experts' testimony and the relevant expert issues in each case, there is no basis for concluding that any two cases are substantially related simply because the same experts may testify in both of them.

The remainder of the factors listed above involve general sharing of information between Best Koeppel and Rowan which would occur during the course of any attorney-client relationship involving the defense of these types of lawsuits.[9] The fact that these activities

---

[9]   Although the redactions make it difficult to gain any meaningful understanding of the subject matter of the Rowan memoranda to outside counsel submitted as Rowan Exhibits 7-A and 7-B, examination of the topics identified in the reference lines of those memos strongly suggest that these documents merely conveyed standard instructions that any company routinely engaged in substantial volumes of litigation would give to its lawyers.

occurred does not shed light upon the similarity between, much less the identity of, the subject matter of any of the prior lawsuits and that of *Parker*. Unless something more specific is shown, the necessary nexus is missing.[10]

> The Courts' exacting analyses in *Duncan*, which involved repeated prior representations in the same type of case, and in *American Airlines* leave little doubt that the superficial similarities raised by Rowan here will not pass muster. In a matter strikingly similar to this one, this Court also refused to disqualify an attorney who had previously represented a party adverse to his firm's current client in twenty Jones Act personal injury cases, finding no substantial relationship between the prior and current representations. *Hampton v. Daybrook Fisheries, Inc.*, 2001 WL 1444933 at *1 (E.D. La. 11/14/01). In *Hampton*, the Court assiduously applied the *Duncan* methodology and found the subject matters of the prior cases and the current one were related only in the sense that they involved maritime personal injuries, "a superficial resemblance," and that the defendant's allegations of substantial relationship and impropriety were "factually inaccurate" and "conclusory." *Id*. at *3. The Court was unimpressed by the former client's assertions that counsel "was privy to information regarding [the client's] financial status, defense strategies, claims evaluation procedures and settlement goals in these types of personal injury suits that he could use" against his former client in the current litigation,

---

[10]   The information at issue here is also in the nature of "play book" information, discussed at pp. 35-37 , *infra*. Likewise, these exchanges of information may be more pertinent to the inquiry under Louisiana Rule 1.9(b) regarding whether confidential information disclosed during a prior representation could be used to Rowan's disadvantage in *Parker*. As discussed at 37-41, *infra*, Rowan has failed to identify any specific confidential information that could be so used.

696678/2

information very similar to the "standardized procedures" and "instructions to counsel" relied upon by Rowan here. The Court should reach here the same conclusion reached in *Hampton*, that "[t]he Fifth Circuit requires much more than superficial similarities to satisfy the 'substantial relationship' test." *Id.*

        **b.**        **Parker is Not Substantially Related to the Talley, Fincannon or Cantner Case.**

Despite its contention that all prior representations are substantially related to *Parker*, Rowan focuses on three specific cases to "illustrate their substantial relationship with the *Parker* matter." Original Memorandum in Support, p. 10. The first such "illustrative" case is *Talley v. Rowan Companies, Inc.*, No. 101223 on the Docket of the Sixteenth Judicial District Court for the Parish of St. Mary. Talley was a roustabout on a jack up rig owned by Rowan, the GILBERT ROWE. Petition in *Talley v. Rowan*, ¶ 5, attached hereto as BK Exhibit 16. Talley was not injured by an accident but became ill while on the rig, experiencing vomiting and severe abdominal pain for a number of hours. *Talley* Petition, ¶¶ 13, 16. Talley claimed that his illness was caused by food poisoning from food served to him on the rig and that this constituted Jones Act negligence and unseaworthiness. *Talley* Petition, ¶¶ 10(c) and (j), 13. Talley also averred that once he became severely ill, Rowan refused for many hours his request to be transported from the rig to a hospital. *Talley* Petition, ¶¶ 14, 16. Talley also alleged failure to provide him with necessary medical treatment while he was on board the vessel and waiting to be transported. *Talley* Petition, ¶¶ 10(g), 11. Failure to provide medical care and removal from the rig were also

alleged to constitute Jones Act negligence and unseaworthiness. *Talley* Petition, ¶ 10.[11]  Mr.

Talley's illness apparently involved a ruptured or perforated diaphragm and a host of

complications arising therefrom, resulting in serious damage to his internal organs.  Deposition

of William P. Hedrick in *Talley v. Rowan*, pp. 234-235, attached hereto as BK Exhibit 18.

Before he went to work for Rowan, Talley apparently had suffered from a perforated esophagus

for which he had undergone surgery. *Id.* at p. 235.  A major issue in the *Talley* case was whether

the plaintiff had misrepresented his medical history in his job application and failed to

sufficiently disclose this pre-existing condition.  Rowan maintained that because of these

misrepresentations it did not owe Talley an obligation of maintenance and cure.  Hedrick

Deposition in *Talley*, p. 132; Answer in *Talley v. Rowan*, First Defense, Second Defense,

attached hereto as BK Exhibit 19; Memorandum of Fact and Law in *Talley v. Rowan*, p. 3.

       Rowan states in its Original Memorandum in Support that one of the topics at

Rowan's corporate deposition in *Talley* was the company's "policies and procedures for removing

injured workers from the rig and for providing medical treatment to injured personnel on drilling

rigs."[12]  However, Mr. Hedrick's deposition testimony in *Talley* makes it clear that Rowan's only

---

[11]    It appears that by the time the plaintiff filed his pre-trial memorandum, the primary basis urged for unseaworthiness and Jones Act negligence was the serving of raw contaminated food. *Talley* Plaintiff's Memorandum of Fact and Law, pp. 6-8, attached hereto as BK Exhibit 17.

[12]    The transcript of that deposition shows that Mr. Hedrick testified that Rowan's policy or procedure for evacuation of injured or ill workers from drilling rigs was contained in "very broad generalistic fashion" in Rowan's "Welcome Aboard" manual, given to each person who comes aboard one of its rigs, and in its Safety and Health Policy and Procedures Manual. Hedrick Deposition in *Talley*, pp. 31-33, 37-38. Mr. Jamie Rawson,
*(continued on next page)*

696678/2

"policy or practice" on these subjects is simply to allow the persons involved, including the supervisor in charge of the rig and the person who is ill or injured, to exercise "common sense" regarding whether and when the ill or injured worker should be taken off the rig to obtain medical treatment. Hedrick Deposition in *Talley*, pp. 32-35. This essentially amounts to an absence of a policy, in that each instance is handled on an ad hoc, case-by-case basis in accordance with varying circumstances.

Rowan's contention that *Talley* and *Parker* are substantially related clearly has no merit. As discussed above, the fact that Jones Act negligence, unseaworthiness and maintenance and cure causes of action are asserted in each case and the fact that Mr. Talley's illness and Mr. Parker's accident both occurred on jack up drilling rigs owned by Rowan are superficial similarities that neither establish nor suggest identity of subject matter. There is no similarity whatsoever in the cause of each plaintiff's injury; Talley allegedly was made ill by food poisoning while Parker's arm was injured as a result of a malfunction of the cathead and draw works on the rig where he was working.

―――――――――――――

who was in charge of the rig at the time Mr. Talley became ill, on the other hand, testified that Rowan had no written procedure regarding when and how to evacuate ill workers from a rig. Deposition of Jamie Rawson in *Talley v . Rowan*, p. 69, attached hereto as BK Exhibit 20. As recently as September 2, 2003, Rowan's counsel represented to Best Koeppel's counsel that he was uncertain whether such written procedures existed. Letter from George Ernest III to Keith Hall, September 2, 2003, p. 2, Item 4, attached hereto as BK Exhibit 21. Because Rowan has refused to produce either of these documents, it is impossible to tell what, if anything, they provide regarding these subjects. However, given Mr. Rawson's testimony and Mr. Hedrick's elusive responses on the issue, it seems questionable whether anything written in these documents could reasonably be classified as a written policy or procedure.

696678/2

Rowan seizes upon Talley's allegation that Rowan "failed to provide him with necessary medical treatment and to properly respond to his medical needs" and contends that Parker "makes similar allegations in Paragraphs VI and VII of his Complaint." Original Memorandum in Support, p. 10. Likewise, Rowan argues that "substantially similar issues" to Rowan's policies and procedures for removing injured workers from rigs and for providing medical treatment to injured personnel on rigs "are alleged in Mr. Parker's complaint." (Original Memorandum in Support, p. 11) and Mr. Hedrick's Declaration asserts that "medical evacuation" is an issue presented in *Parker*. Hedrick Declaration, ¶ 13. These are complete mischaracterizations of the nature of the issues in *Parker*. Paragraph VI of Parker's Complaint states that Mr. Parker's injury and "defendant's mismanagement of plaintiff's medical treatment and cure" caused him to develop reflex sympathetic dystrophy and Paragraph VII alleges that Rowan "negligently and/or intentionally failed and refused to provide plaintiff with medical care recommended by defendant's agent and plaintiff's treating physician," aggravating his medical condition. There is no allegation that there was, nor do the facts of the *Parker* case involve, a failure to timely remove an ill or injured person from a rig or to furnish adequate medical treatment while the person remained on the rig. Mr. Parker's only contention with respect to the faulty provision of medical care is that the Rowan employee charged with accompanying him to obtain medical treatment failed to have a prescription filled which might have lessened the likelihood that Mr. Parker would develop dystrophy. Best Affidavit, ¶ 6. That discrete, isolated act of neglect by Rowan's agent, not implicating any Rowan policy or procedure – and certainly

696678/2

unrelated to any Rowan practice, policy or procedure with respect to removal of injured and ill workers from rigs – is also unrelated to the facts and issues in *Talley*. Best Affidavit, ¶ 22.

Next, Rowan relies upon the facts that James Rawson was the rig superintendent on the GILBERT ROWE when Talley became ill and rig manager on the CECIL PROVINE when Parker was injured (and when Fincannon was injured) and that Best Koeppel defended his deposition in *Talley*. Hedrick Declaration, ¶ 17. Again, these superficial similarities do not reflect on any relationships between the subject matter of the cases and are irrelevant.

Finally, Rowan argues that a number of experts in the *Talley* matter have been retained as experts in *Parker*, without specifying the subject matter about which these experts testified in *Talley* or are expected to testify in *Parker*. Given the totally different injuries and causes of injury in the two cases, it is no surprise that Rowan has left out these details; undoubtedly the expert issues in the two cases bear no meaningful similarity. Moreover, the use of common experts in two cases has never been cited by the Fifth Circuit as a basis for finding substantial relationship. Aside from the fact that having the same experts does not bear upon whether the cases involve the same subject matter, adoption of such a criterion would allow a party to engineer substantial similarity by choosing to retain in current litigation an expert his former counsel worked with during a prior representation. Rowan is not compelled to retain in *Parker* the same experts it used in *Talley* or in other prior cases in which Best Koeppel were its counsel but is free to retain other experts if it wishes.

Accordingly, it is clear that there is no identity of subject matter in *Talley* and *Parker* and that those cases are not substantially related. The matters at issue in each case

696678/2

involve separate, isolated acts of alleged negligence and unseaworthy conditions which are unrelated as to nature and cause. The only remote similarity between the cases is that, in each, a different Rowan agent is alleged to have negligently failed to perform an act which worsened the plaintiff's condition. However, differences in the identity of the agents, the nature of the negligent acts and the resulting damages render the cares substantially unrelated. Comparing the nexus between these two cases with that between the cases analyzed by the Fifth Circuit in its decisions leaves no doubt that no substantial relationship is present here.

The second case relied upon by Rowan is equally unrelated. *Fincannon v. Rowan*, No. 106473 on the Docket of the Sixteenth Judicial District Court for the Parish of St. Mary involved a derrick man who died after suffering severe chemical burns while mixing drilling fluids aboard the CECIL PROVINE rig. Petition in *Fincannon v. Rowan*, ¶ VI, attached hereto as BK Exhibit 22. Mr. Fincannon was burned by caustic soda in the chemical mixing room of the rig. Deposition of Jamie Rawson in *Fincannon v. Rowan*, pp. 22-23, 61, attached hereto as BK Exhibit 23. The only relationship between *Fincannon* and *Parker* is that the injury suffered by the Rowan employee in each of them occurred on the same rig and that two of the same causes of action (negligence and unseaworthiness) were asserted in both cases. Totally different and dissimilar acts of negligence and conditions of unseaworthiness were alleged. None of the same individuals were alleged to have been negligent in both cases. Best Affidavit, ¶ 23. The accidents at issue and the injuries they caused were entirely different and even the locations on the rig where the accidents occurred are different. Thus, the subject matter of

696678/2

*Fincannon* is clearly not the same as the subject matter of *Parker* and the cases are not substantially related.

Rowan urges the overlap in some of the crew members on the rig on the dates of the Fincannon and Parker accidents and the fact that some of the crew members interviewed by Best Koeppel in connection with *Fincannon* were on the rig when Parker was injured as significant factors. However, Rowan does not even offer evidence that any of the overlapping crew members have any meaningful connection with both accidents. Moreover, without evidence establishing that the two cases involve the same subject matter, the mere possibility of some common witnesses is irrelevant to substantial relationship.

Rowan also suggests because Mr. Koeppel "inspected and photographed the CECIL PROVINE" in connection with the *Fincannon* matter and provided Mr. Hedrick with a confidential report "commenting on the results of his inspection and how it might impact ROWAN's defense in the *Fincannon* matter," these cases are substantially related. Original Memorandum in Support, p. 10. As with the other similarities relied upon by Rowan, this one has no substance. As indicated by Mr. Koeppel's report, correspondence to Mr. Hedrick dated December 22, 2000, attached hereto as BK Exhibit 24,[13] and in his Affidavit, Mr. Koeppel's inspection was limited to an examination of the chemical room on the CECIL PROVINE and, "more particularly the caustic barrel in question." Koeppel Affidavit, ¶ 15. The report does not suggest that Mr. Koeppel acquired any information or directed any attention to any aspect of the

---

[13]     This document is being filed under seal pursuant to a confidentiality agreement between Rowan and Best Koeppel entered pursuant to the Magistrate Judge's discovery ruling.

696678/2

rig that would have relevance to the *Parker* case and, in fact, he did not. *Id*. In particular, there is no mention of the cathead or draw works which caused Mr. Parker's injuries. Nothing in Mr. Koeppel's report or his inspection related in any way to the *Parker* case and that report has absolutely no bearing on the existence of a substantial relationship between *Parker* and any prior representation of Rowan by Best Koeppel. *Id*.

Finally, Rowan advances *Cantner v. Rowan Companies*, No. 108345 on the Docket of the Sixteenth Judicial Court for the Parish of St. Mary as the third "illustrative" case. The accident that injured Mr. Cantner resulted in his leg and knee being crushed between two baskets during a lift using one of the cranes on the ROWAN FORT WORTH rig. Petition in *Cantner v. Rowan*, ¶¶ 6-9, attached hereto as BK Exhibit 25. Plaintiff alleged that the crane operator was negligent and that there was negligence in the use of the starboard crane to lift on the port side of the rig and in the failure to use a flagman. The same acts or failures to act are alleged as bases for the unseaworthiness of the ROWAN FORT WORTH. *Id*.

Once again, it is apparent that there is no substantial similarity between the *Cantner* and *Parker* cases. The only superficial similarities are that each case involves allegations of negligence and unseaworthiness and an accident on one of Rowan's jack up drilling rigs. There is no commonality in the subject matter of these two cases and therefore, under Fifth Circuit precedents, they are not substantially similar.

The approach taken by Rowan in its Motion to Disqualify bears a striking resemblance to that used by Merrill Lynch and held inadequate by the Fifth Circuit in *Duncan*. As Merrill Lynch did, Rowan cites a number of prior cases involving claims of a type that are

generally similar to those asserted in the present case but fails to give any detailed information regarding the factual subject matter of those cases from which it could be determined whether any of them is substantially related to the present case. Likewise, as Merrill Lynch did, Rowan gives additional details regarding a few specific cases. However, to the extent the factual subject matter of these cases is discussed, there is no explanation of the relationship of that subject matter to that of the current case. Likewise, as Merrill Lynch did in *Duncan*, Rowan claims generally that it disclosed its "practices, procedures and policies" to Best Koeppel but fails to identify the nature and substance of such practices, procedures and policies and what relationship they may have to the *Parker* case. The evidence submitted by Rowan to establish substantial relationship is at least as flawed and inadequate as that submitted by Merrill Lynch in the *Duncan* case and will not support a motion to disqualify.

c.   **Parker** **is Not Substantially Related to Prior "Non-Specific Litigation" Matters.**

Rowan states that it sought the advice of Best Koeppel regarding other matters that were not necessarily in litigation, such as "maintenance and cure issues" and "important decisions rendered in the maritime and employment law fields (as they related to personal injury claims), and how those decisions may affect Rowan in the future." Original Memorandum in Support, p. 17. Rowan also indicates that Mr. Best spoke at one of Rowan's supervisor training seminars. *Id.* Although Rowan classifies these alleged representations as grounds for disqualification under Rule 1.9(b), it makes no showing that they involved the disclosure to Best Koeppel of confidential information and it seems more appropriate to analyze them under the substantial relationship test.

- 32 -

Rowan fails to specify the nature of the maintenance and cure issues, the subject matter of the court decisions or the topic of Mr. Best's presentation at the supervisor training seminars. Unless there is some relationship between the subject matter involved in each of these representations and that in the *Parker* case, there is no basis for finding a substantial relationship between them. Mr. Best's and Mr. Koeppel's affidavits indicate that, to the best of their recollections, the subject matters of these prior representations were different from any of the subject matter of the *Parker* case. Best Affidavit, ¶ 25; Koeppel Affidavit, ¶ 17. In particular, Mr. Best's presentation at the Rowan seminar involved routine procedures for investigating and reporting accidents. Best Affidavit, ¶ 26. Thus, there is no substantial relationship between *Parker* and any representation by Best Koeppel of *Rowan* not involving specific litigation.

In an obvious afterthought seeking to bolster Rowan's non-existent substantial relationship case, the Hedrick Declaration, ¶ 4, states that Rowan sought legal opinions from Best Koeppel regarding "discovery of self-critical analysis privileges" and "discovery of corrective action forms." Hedrick then states that a corrective action form was completed in connection with the Parker incident and concludes that Best Koeppel's prior advice "will have a direct bearing on the discoverability of the [Parker] corrective action form." *Id.* Best Koeppel recalls no specific retention by Rowan regarding this issue. The only case Mr. Best recalls involving a corrective action form was *Fincannon*, where such a form was prepared after the accident. Best Affidavit, ¶ 24. Best Koeppel was instructed by Mr. Hedrick to produce the form in discovery, notwithstanding that there may have been some brief discussion of arguable non-discoverability on grounds of an alleged self-critical analysis privilege. *Id.*

696678/2

Rowan's conclusory argument, which is no more than a desperate and transparent attempt to manufacture a substantial relationship between *Parker* and some aspect of Best Koeppel's prior representation, fails for a number of reasons. First, the subject matter overlap that Fifth Circuit case law defines as dispositive in establishing substantial relationship is that involving the factual substance of the representation; legal advice given to a client regarding a routine, recurrent evidentiary issue is not the sort of subject matter that the cases have found to result in a substantial relationship when that issue arises in a subsequent case.[14]   Moreover, Rowan's proof here regarding the existence of the "corrective action discoverability" issue in the *Parker* case is conspicuously weak. Hedrick merely asserts that a corrective action form was completed in *Parker*, not that one was required or appropriate. As has been typical of the evidence Rowan has submitted in connection with this Motion, there is no explanation of the form, of the information on the form or other details regarding the "corrective action" involved in *Parker*, and, of course, Rowan does not offer the form in evidence. Rowan could easily have filled in a "corrective action form" regarding the Parker incident for no purpose other than to try to create an impression of a relationship between *Parker* and a subject on which Best Koeppel allegedly advised it in the past. Such thin support for a nexus between two representations falls far short of the requirements to establish a true substantial relationship.

---

[14]   Indeed, Mr. Best's Affidavit suggests that the *Parker* case involves clear and certain liability where the only significant issue is quantum, a view supported by Rowan's pre-suit settlement offer of $500,000 made by Mr. Hedrick's superior, Mr. Danny McNeese, to Parker's counsel, Mr. John Lee. Best Affidavit, ¶ 24; Koeppel Affidavit, ¶ 5.

696678/2

**d.     Presumed "Insight" From Prior Representation Does Not Create a Substantial Relationship.**

Because there is no real factual subject matter relationship between the *Parker* case and any matter in which Best Koeppel previously represented Rowan, Rowan tries to construct a substantial relationship case based upon Best Koeppel's presumed "insight . . . gained over the past fifteen years" with respect to the "ins and outs of Rowan's business," "the key players," "the types of documents that exist," and "Rowan's strengths and weaknesses." Original Memorandum in Support, pp. 12 and 13. As with every other aspect of the prior representations, Rowan fails to specify any details of the insight it claims Best Koeppel has acquired. However, whatever the nature of that claimed insight might be, the authorities concur that this type of general knowledge that lawyers might obtain from representing a client is not a basis for disqualification. Comment 2 to Rule 1.9 of the Model Rules, states in pertinent part: "A lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client. . . . The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."

In explaining why the Restatement does not allow disqualification based on former counsel's acquisition of such general "play book" information, the Restatement's chief reporter explained that such a proposition "would require a rule very much like the opposite of the rule that a lawyer is free to proceed adversely to a former client unless a substantial relationship is shown. Such play book information would, presumably, equally benefit the new

- 35 -

client in any sort of proceeding whether (otherwise) substantially related or not, that would portend both over-application of the substantial relationship test and a large increase in the number of motions to disqualify." Wolfram, FORMER CLIENT CONFLICTS, 10 Geo. J. Legal Ethics 667 (1997). Under the Restatement, information about such matters as a former client's preferred approach to bargaining in settlement discussions, willingness to be deposed by an adversary or financial ability to withstand extended litigation are "so general, readily observable, or of little value in the subsequent representation that it should not by itself result in a substantial relationship." Restatement, § 132, Comment (d)(iii). It is only when such information is directly in issue or of unusual value in the subsequent matter that it is independently relevant in assessing a substantial relationship. *Id.* Rowan has not established this sort of relevancy here. Indeed, Rowan has conspicuously omitted any reference to specifics or details and, in responding to Best Koeppel's discovery requests, admitted that the information in question is of the type conveyed in exchanges "normally conducted between a client and its attorney in defending personal injury claims." Rowan's Response to Interrogatories, Response to Interrogatory No. 8. Moreover, Mr. Best and Mr. Koeppel state in their affidavits that they never acquired the kind of insight into Rowan's inner workings conclusorily alleged by Rowan. Best Affidavit, ¶ 27; Koeppel Affidavit, ¶¶ 4 and 18. On the contrary they never discerned any overriding approach of the company toward litigation, negotiation or settlement. *Id.*

In any case, the Fifth Circuit and this Court have refused to consider general knowledge about the client acquired from long-standing representation in similar cases to establish substantial relationship. *See, e.g., Duncan,* discussed at pp. 18-19, *supra,* and

696678/2

*Hampton*, discussed at p. 23-24, *supra*. Thus, it is clear that Rowan has not met its burden of establishing a substantial relationship between *Parker* and any aspect of Best Koeppel's prior representation of Rowan.

### C.   Rowan Has Not Established that it Disclosed to Best Koeppel Confidential Information that Could be Used to Rowan's Disadvantage in *Parker* Under Louisiana Rule 1.9(b).

Rowan argues in the alternative that if there is no substantial relationship between the present and prior cases, Best Koeppel nonetheless should be disqualified under Rule 1.9(b). As discussed above, this rule requires proof that specific confidential information disclosed during the course of a prior representation could be used to the disadvantage of the former client in the current case.[15] Thus, the moving party may disqualify counsel on this grounds only "by

---

[15]   At pp. 4-5 of its Memorandum in Opposition to Best Koeppel's Appeal from the Magistrate Judge's discovery ruling, Rowan argued that Rule 1.9(b) of the Louisiana Rules of Professional Conduct requires disqualification when any information, not only confidential information, acquired during the course of the prior representation could be used to the disadvantage of the former client in the current representation. [Cite] In support of this argument, Rowan cites language from the *Brennan's, Inc.* case, *supra*. However, Rowan's argument is based on outdated standards and misapplication of precedent.

In *Brennan's*, the lawyer sought to be disqualified had previously represented the Brennan family in applying for federal trademark registrations. Subsequently, when a dispute developed among the Brennans, one faction of the family retained the former counsel to represent it against the other faction in trademark infringement and unfair competition litigation relating to the very trademark counsel had registered. In their answer and counterclaim, the defendants alleged that the marks were registered in plaintiffs' name for convenience only, and "in truth and actuality, the applications were filed and the registrations issued for the benefit and ownership of all the Brennan family restaurants, including the corporate defendants." Defendants also alleged that the marks and registrations were invalid. 590 F.2d at 171. Despite the fact that the prior and present representations involved the same subject matter, counsel argued that he should not be disqualified because none of the disclosures made by his former clients who were

***(continued on next page)***

- 37 -

696678/2

.

---

now adverse were confidential *vis a vis* his current clients. Under these circumstances, the *Brennan's* Court, applying an Ethical Consideration from the Model Code and the definitions of "confidence" and "secret" in the Disciplinary Rules of the Model Code, concluded that it was not necessary that information learned by an attorney during the prior representation constitute information technically shielded by the attorney-client privilege or that it have been disclosed to counsel under a specific condition of confidentiality in order to result in disqualification.

Since the *Brennan's* decision, the Model Rules have replaced the Model Code. The definitions from the Model Code are not applicable to the Model Rules or to Rule 1.9(b) of the LOUISIANA RULES OF PROFESSIONAL CONDUCT, which is based on the Model Rules. Moreover, had *Brennan's* been decided under the Model Rules, it would not have been necessary to consider the character of the information acquired during the prior representation. Rather, because the prior representation clearly involved the same subject matter and therefore was substantially related to the current one, disqualification should be automatic.

Moreover, the cases interpreting the Model Rule analog of Louisiana Rule 1.9(b) refer to potentially detrimental "confidential information" obtained by virtue of the prior representation as the sort of disclosure that could result in disqualification. The *American Airlines* Court stated:

"In providing two distinct grounds for disqualification, the Rules expand the protections for former clients beyond those afforded by the substantial relationship test. The Rules are not, however, broader than the protections provided by our precedents. While the focus of our cases has been on the substantial relationship test, we have indicated that a former client could also disqualify counsel by showing that his former attorney possessed relevant <u>confidential</u> information in the manner contemplated by Rule 1.09(a)(2). As *Duncan*, for example, stated: '[the moving party may disqualify counsel on the basis of prior representations] either by establishing that the present and previous representations are substantially related or by pointing to specific instances where it revealed relevant <u>confidential</u> information regarding its practices and procedures.'" *Duncan*, 646 F.2d at 1032. (Emphasis added) 972 F.2d at 615

Likewise, Comment 11 to Rule 1.9 of the Model Rules states that "the fact that a lawyer has once served a client does not preclude the lawyer from using <u>generally</u> <u>known</u> information about that client when later representing another client." (Emphasis added) Further, the annotations to the Model Rules specifically state that it is "confidential information" that may not be used to a client's disadvantage after termination of the client-lawyer relationship. American Bar Association, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT, 4th Edition, p. 155. *See also* Restatement, § 132, Comment (f).

pointing to <u>specific instances</u> where it revealed <u>relevant confidential information</u>. . . ."
(Emphasis added) *American Airlines*, 972 F.2d at 615, citing *Duncan*, 646 F.2d at 1032. Rowan
has failed to identify any such information disclosed to Best Koeppel.

   Rowan argues that Mr. Hedrick frequently conveyed to Best Koeppel
"confidential information about Rowan's internal practices, policies and procedures." Original
Memorandum in Support, p. 17. However, in response to written discovery requests, Rowan has
refused or has been unable to identify specific practices, policies and procedures to which it is
referring. Rowan's Response to Interrogatories, Response to Interrogatory No. 10. Besides
failing to establish that confidential internal practices, policies and procedures were disclosed,
Rowan also has failed to prove that any such supposed disclosures involved information that
could be used to its disadvantage in *Parker*. Like the information regarding "financial status,
defense strategies, claims evaluation procedures and settlement goals" which this Court found
insufficient in *Hampton*, these vague assertions of confidential disclosures do not meet Rule
1.9(b)'s requirements. Moreover, Mr. Best's and Mr. Koeppel's affidavits establish that they are
unaware of any such disclosures of information that could be used to Rowan's disadvantage in
the *Parker* case. Best Affidavit, ¶ 27; Koeppel Affidavit, ¶ 18.

   The same is true of Rowan's argument that it disclosed confidential claim files to
Best Koeppel. As established by their affidavits, Mr. Best and Mr. Koeppel did receive
confidential claim files involving some of the individual claims which they defended on behalf
of Rowan in the past. However, none of those files involved *Parker* or his claim or contained
information which could be used to Rowan's disadvantage in the *Parker* case. Best Affidavit,

¶ 15; Koeppel Affidavit, ¶ 19.   Rowan has not specifically identified any such information

meeting the Rule 1.9(b) criteria.

The third category of information which Rowan contends triggers disqualification

under Rule 1.9(b) is the document it characterizes in its Original Memorandum in Support as "a

confidential study [which it provided to Best Koeppel] prepared by an expert retained by Rowan

regarding the rate of maintenance and cure."  Original Memorandum in Support, p. 17.   As

established by Best's affidavit, this study is no more than a summary of the results of a survey of

market prices of hotel rooms and perhaps meals geared toward determining the *per diem* cost to

maintain an injured seaman.  Best Affidavit, ¶ 16.   It does not contain confidential internal

company information, but summary data regarding prices in the market.  As established by Mr.

Best's testimony, moreover, he was told by Mr. Hedrick that the study was commissioned not

only by Rowan, but by other companies and the information in the study was disclosed without

confidentiality or other restrictions during the course of prior litigation.[16]   Best Affidavit, ¶¶ 17

and 19.  Indeed, the purpose of the study was to establish in litigation a reasonable rate of

maintenance.   Without disclosure of the contents of the report to support defendants' rate

determination or their expert economists' opinion, it would have been useless.  Best Affidavit,

¶ 18.  Moreover, Rowan fails to demonstrate how the information in the report could be used to

its disadvantage in *Parker*.  Indeed, this report is used to support Rowan's contentions regarding

---

[16]      In his Declaration, ¶ 24, Mr. Hedrick asserts that the study and its updates were funded
solely by Rowan.  This contradicts Mr. Hedrick's representations to Mr. Best.  In any
case, Mr. Hedrick does not contradict any of Mr. Best's other statements establishing the
non-confidential nature of the study.

the appropriate maintenance rate.  Finally, the study was to be updated periodically.  The current

maintenance rate surveys have not been disclosed to Best Koeppel by Rowan and the versions of

the survey that Best Koeppel did see may now be outdated and obsolete.  Best Affidavit, ¶ 19.

## III.   CONCLUSION

Rowan has failed to meet its burden of establishing a substantial relationship

between any Best Koeppel prior representation of Rowan and the *Parker* case.  It also has failed

to identify any specific confidential information disclosed to Best Koeppel in any prior

representation that could be used against Rowan in *Parker*.  Therefore, Rowan's Motion to

Disqualify must be denied.

Respectfully submitted,

Wayne J. Lee, 7916, T.A.
Stephen G. Bullock, 3648
Keith B. Hall, 24444
            Of
STONE PIGMAN WALTHER
       WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200

Attorneys for Best Koeppel APLC, Laurence E.
Best, and Peter S. Koeppel

- 41 -

## CERTIFICATE

I hereby certify that a copy of the above and foregoing Memorandum in Opposition to Motion to Disqualify Plaintiff's Counsel has been served upon all counsel of record by facsimile and by placing same in the United States mail, postage prepaid and properly addressed, this 4th day of November, 2003.

*Stephen Bullock*

696678/2

# SEE  RECORD  FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT  SCANNED